IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:19 CV 248

| | | |
|---|---|---|
| FRANK STEPHEN ROBERTS | ) | |
| | ) | |
| Plaintiff, | ) | MEMORANDUM AND |
| v. | ) | RECOMMENDATION |
| | ) | |
| DELTA AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant's Motion to Dismiss (Doc. 14), which has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B). Having carefully considered the parties' filings, the record, and applicable authority, the undersigned respectfully recommends that the Motion be granted.

## I. Procedural Background

On August 23, 2019, Plaintiff Frank Stephen Roberts ("Plaintiff") filed his original Complaint. Doc. 1. The District Court dismissed that Complaint without prejudice pursuant to 28 U. S. C. §1915(e) but gave Plaintiff leave to file an amended complaint within fourteen (14) days. Doc. 3. That deadline was subsequently extended. Doc. 5.

Plaintiff filed his Amended Complaint on October 28, 2019. Doc. 6. The District Court initially dismissed Plaintiff's Amended Complaint as untimely

but allowed a later Motion to Reconsider by Plaintiff and reopened the case. Docs. 7-10.

Defendant Delta Airlines, Inc. ("Defendant") filed its Motion to Dismiss on February 28, 2020.  Doc. 14.

Plaintiff did not respond to the Motion to Dismiss within the allotted time.

On April 13, 2020, the undersigned advised Plaintiff that if he did not submit a response to the Motion to Dismiss by April 27, 2020, the Court may proceed to consider the Motion to Dismiss without hearing from him.  Doc. 16.

On April 27, 2020, Plaintiff filed a motion to extend his response deadline by 30 days.  The Court granted his request and extended his response deadline to May 27, 2020.  Docs. 17 & 18.

On June 1, 2020, Plaintiff filed a second motion for extension of time, which was allowed, and his response deadline was further extended to June 26, 2020.  Docs. 19 & 20.

On June 26, 2020, Plaintiff filed a response. Doc. 22.

## II. Factual Background[1]

Plaintiff is a citizen and resident of Buncombe County, North Carolina. Defendant is a Delaware corporation with its principal place of business in Atlanta, Georgia. Pl.'s Am. Compl. (Doc. 6) at ¶¶ 3-4.

On August 18, 2016, Plaintiff traveled from Asheville, North Carolina to Rio de Janeiro, Brazil to see the Olympic Games. Id. at ¶ 8.

He "did not have a return ticket due to unforeseen circumstances" and, while in Rio de Janeiro, needed emergency assistance from the U.S. Embassy to return to the United States.[2] Id. at ¶¶ 8-9.

The Embassy obtained an airline ticket on Plaintiff's behalf and paid for a hotel room for him prior to his scheduled departure.[3] Id. at ¶ 10.

---

[1] In light of Plaintiff's *pro se* status, the facts set forth in Plaintiff's original Complaint have been considered in addition to those contained in the Amended Complaint. See Jones v. Curran, No. 3:11CV37, 2011 WL 4402753, at *1 (W.D.N.C. May 18, 2011), report and recommendation adopted, No. 3:11-CV-37-RJC-DLH, 2011 WL 4402669 (W.D.N.C. Sept. 21, 2011)("Although an amended complaint typically supercedes the original complaint rendering it void of any legal significance in the case, Young v. City of Mount Ranier, 238 F.3d 567, 572 (4th Cir.2001), the Court will consider the combined allegations in the two pleadings because Plaintiff is proceeding pro se.").

[2] It is not clear why Plaintiff needed emergency assistance.

[3] Plaintiff's original Complaint states that "[he] had a ticket bought and paid for from Delta" and that he "want[ed] the cost of [his] ticket reimbursed." Pl.'s Compl. (Doc. 1) at 4-5. Therefore, it appears that though the Embassy obtained the ticket for him, Plaintiff paid for it himself.

"Embassy officials" told Plaintiff that his ticket, which was from Defendant, was a first-class ticket from Rio de Janeiro to Asheville. He also alleges that the ticket indicated he was handicapped and would require accommodations due to his disability. Id. at ¶ 11.

On August 24, 2016, an Embassy official transported Plaintiff to the airport, entered the airport with Plaintiff, and assisted him with checking his baggage. The official also waited in line with Plaintiff and had Plaintiff's ticket. Id. at ¶¶ 12-14.

The Embassy official accompanied Plaintiff to the gate, where a gate attendant spoke to the official, apparently outside of Plaintiff's hearing. The Embassy official then advised Plaintiff that the gate attendant would not allow Plaintiff to board the flight, though the Embassy official reported that the gate attendant did not provide a reason for doing so. Id. at ¶¶ 15–16.

After the other passengers boarded the plane, Plaintiff asked the Embassy official what he should do next and was told that he should wait for the next flight. The Embassy official then left Plaintiff at the airport. Id. at ¶ 17.

Plaintiff recovered his luggage and went to "the airport magistrate's office," which Plaintiff alleges resolves disputes between customers and airlines. There, Plaintiff filed a complaint and explained that he was not allowed to board his ticketed flight. Id. at ¶¶ 18–19.

Plaintiff remained in front of "the magistrate's office" overnight with his baggage and slept on a concrete floor, "in constant fear of being robbed." Id. at ¶¶ 20–21.

On the morning of August 25, 2016, Plaintiff was approached by an emergency medical team consisting of a woman and two men. The woman identified herself as Dr. Martinelli, a physician, and explained that she had been called to examine Plaintiff. She then proceeded to conduct a physical examination of him, gave him time to collect his luggage, and walked him to Defendant's terminal. Dr. Martinelli provided a written report to one of Defendant's employees and "sternly told him" that there was no medical reason Plaintiff should not have been allowed to board the flight the day before and that he should be allowed to board a flight that day. Id. at ¶¶ 22–24.

Defendant's employee stated that the evening flight would be the only flight with suitable connections for Plaintiff's return to Asheville and that Plaintiff could board that flight. Id. at ¶ 25.

Plaintiff returned to the gate that afternoon and checked in. He presented his ticket "from the night before" and explained the conversation between Dr. Martinelli and Defendant's employee. Plaintiff then waited in the boarding area and got in line to board the flight with the other passengers. However, the gate attendant advised Plaintiff that he was not on the list to board. Id. at ¶¶ 26–28.

5

After further discussions with the gate attendant, Plaintiff was not allowed to board the flight, and the gate attendant instructed the baggage crew to remove Plaintiff's baggage from the plane. The gate attendant also advised Plaintiff that her supervisors were gone for the day. Id. at ¶¶ 29–32.

Plaintiff then recovered his baggage and returned to "the magistrate's office" where he again slept on a concrete floor. Id. at ¶ 33.

Plaintiff further alleges that, on the morning of August 27, 2016, an official from "the magistrate's office" told him he had a ticket for Plaintiff to get to Miami on Latam Airlines but that Plaintiff needed to board immediately.[4] The official and his assistant took Plaintiff's baggage and the official assisted Plaintiff to the gate. Id. at ¶ 34.

Presumably, Plaintiff was able to board that flight as he alleges that he arrived in Miami in the mid-afternoon of August 27, 2016. There, he checked in with Defendant's employees who at first indicated they could not find Plaintiff's ticket in their system. They later found his information but advised that he had missed his connecting flight two days before. Id. at ¶ 35.

---

[4] The Amended Complaint's description of the timing of the underlying events is unclear. The Amended Complaint indicates that Dr. Martinelli's examination of Plaintiff and discussion with Defendant's employee occurred on August 25 and that Plaintiff attempted to board a flight later that day, presenting his ticket "from the night before" (August 24). (Doc. 6) at ¶ 24. However, the Amended Complaint also indicates that, after Plaintiff was not allowed to board the flight, he returned to the magistrate's office and that "[t]his was the evening of the 26th." Id. at ¶ 33.

Plaintiff spent three or four hours calling various customer service numbers for Defendant and requesting a hotel room, unsuccessfully. Id. at ¶¶ 37–38.

Plaintiff slept in the Miami-Dade airport that night where he was robbed of his carry-on bag, which included his airline tickets, passport, wallet, cell phone, and a copy of Dr. Martinelli's medical report. Id. at ¶ 39.

In his original Complaint, Plaintiff alleged that he was "put on a flight to Atlanta, then to Asheville. They could only find my reservations from three days ago!?!" Pl.'s Compl. (Doc. 1) at 5.[5]

On August 28, 2016, Plaintiff arrived at the Asheville airport, where he was picked up by his office manager. Doc. 1 at 5. This individual took Plaintiff directly to Mission Hospital as she was afraid that Plaintiff had suffered a stroke or some other condition. Plaintiff was admitted to the hospital that day and was discharged the following day with a referral to follow up with various specialists. Id. at ¶¶ 40 – 41.

Some months later, Plaintiff underwent two surgeries – one on February 15, 2017 and a second on April 18, 2017, which Plaintiff alleges were needed "to repair injuries [he] sustained that resulted from the actions and omissions"

---

[5] Though the allegations are not entirely clear, it would appear that Defendant ultimately located Plaintiff's information and transported Plaintiff from Miami to Asheville by way of Atlanta the day after he slept in the Miami airport.

7

of Defendant. Id. at ¶ 42.[6]

## III.    Legal Standard

In a motion made pursuant to Rule 12(b)(6), the central issue is whether the complaint states a plausible claim for relief.  See Francis v. Giacomelli, 588 F.3d 186, 189 (4th Cir. 2009). In that context, the court accepts the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009); Giacomelli, 588 F.3d at 192.

The court, however, is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Consumeraffairs.com, 591 F.3d at 255; see Giacomelli, 588 F.3d at 192.  That is, while "detailed factual allegations" are not required, the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007); see Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); accord Consumeraffairs.com, 591 F.3d at 255. In short, the well-pled factual allegations must move a plaintiff's claim from

---

[6] Plaintiff's original Complaint indicates that he required two (2) hernia surgeries. Doc. 1 at 5.

conceivable to plausible. <u>Twombly</u>, 550 U.S. at 570; <u>Consumeraffairs.com</u>, 591 F.3d at 256.

Federal courts extend latitude to the pleadings of *pro se* litigants. <u>See e.g.</u>, <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972) (noting that *pro se* pleadings are held "to less stringent standards than formal pleadings drafted by lawyers"). However, "a pro se complaint must still contain sufficient facts 'to raise a right to relief above the speculative level' and 'state a claim to relief that is plausible on its face.'" <u>Adams v. Sw. Virginia Reg'l Jail Auth.</u>, 524 F. App'x 899, 900 (4th Cir. 2013)(quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

## IV. Discussion

Plaintiff's Amended Complaint includes the following claims: 1) breach of contract, 2) "disability and age discrimination," 3) negligence, and 4) intentional infliction of emotional distress. Pl.'s Am. Compl. (Doc. 6). Defendant argues that these claims are governed by the Montreal Convention and that they are time-barred and fail to state any claim for relief. Def.'s Mem. (Doc. 14-1) at 3.

As noted, Plaintiff has filed a response to the Motion to Dismiss (Doc. 22). The response appears, in so many words, to concede that the Motion to Dismiss should be granted. However, as Plaintiff does not make such a

statement directly, and otherwise has not dismissed his case, Defendant's arguments are addressed below.

### A. The Montreal Convention

The Convention for the Unification of Certain Rules Relating to International Transportation by Air ("Warsaw Convention") was "a uniform system of liability for flights between the United States and Foreign States also party to the Convention and for international flights having their origin and destination in the United States (round trips)." Selke v. Germanwings GmbH, 261 F. Supp. 3d 666, 675, n. 2 (E.D. Va. 2017)(internal citations omitted).

The Warsaw Convention was superseded by the Convention for the Unification of Certain Rules for International Carriage by Air, commonly known as the Montreal Convention, "a multilateral treaty . . . which governs international travel and limits liability for carriers like … Delta Airlines." Dagi v. Delta Airlines, Inc., No. 19-1056, 2020 WL 2847075, at *4 (1st Cir. June 2, 2020)(citing El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 161, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999)).

"Persuasive authority … makes clear that it is appropriate to rely on cases interpreting Warsaw Convention provisions when the equivalent provisions in the Montreal Convention are substantially similar." Selke, 261 F. Supp. 3d at 676 (citations omitted).

### 1. Applicability of the Montreal Convention

The Montreal Convention "applies to all international carriage of persons, baggage or cargo performed by aircraft for reward." Montreal Convention, Art. 1, § 1. The term "international carriage means any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transhipment, are situated either within the territories of two States Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party." Id., Art. 1, § 2.

In this case, Plaintiff traveled from Asheville to Rio de Janeiro for the Olympics, purchased a return ticket (with the assistance of the U.S. Embassy), and traveled by airplane from Rio de Janeiro to Miami, then to Atlanta, and back to Asheville. Further, the United States and Brazil are signatories of the Montreal Convention. Souza v. Am. Airlines, Inc., No. 10 CIV. 5938 DAB KNF, 2011 WL 2749086, at *3, n. 3 (S.D.N.Y. July 7, 2011), report and recommendation adopted, No. 10 CIV.5938 DAB KNF, 2011 WL 3251575 (S.D.N.Y. July 28, 2011)("The United States became a signatory of the Montreal Convention on May 28, 1999, and Brazil became a signatory on August 3, 1999.")

Consequently, Plaintiff was engaged in international travel for purposes

of the Montreal Convention. See Sinnokrot v. Saudi Arabian Airlines Corp., No. 1:19-CV-01376-RDA-IDD, 2020 WL 2738237, at *2 (E.D. Va. Jan. 16, 2020)("It is undisputed that Plaintiff purchased tickets for a flight departing from Dulles, Virginia, to Amman, Jordan, with a layover in Riyadh, Saudi Arabia. Thus, Plaintiff's travel clearly falls within the definition of 'international carriage.'"); Papaiyawala v. Saudi Arabian Airlines, No. 1:15-CV-01651-GBL-JFA, 2016 WL 11668945, at *3 (E.D. Va. Apr. 15, 2016)("In the present matter, a flight originating in India with final arrival in New York, falls under the category of 'international carriage' expressed in the Montreal Convention. Therefore, this matter must be governed by terms expressed in the Montreal Convention.").

### 2. Preemption

The extent to which the Montreal Convention impacts Plaintiff's claims is a separate question.

"The Montreal Convention establishes a presumption of liability against air carriers for three categories of damages arising out of the international carriage of passengers or goods." Atia v. Delta Airlines, Inc., 692 F. Supp. 2d 693, 699 (E.D. Ky. 2010). "The three damage provisions of the Convention are: (1) Article 17 which provides for carrier liability for the death or bodily injury of a passenger or the destruction, loss of or damage to her baggage; (2) Article 18 which provides for damage to cargo; and (3) Article 19 which … provides for

12

carrier liability occasioned by 'delay' in the carriage of passengers, baggage, or cargo." <u>Okeke v. Nw. Airlines, Inc.</u>, No. 1:07CV538, 2010 WL 780167, at *4 (M.D.N.C. Feb. 26, 2010)(citing <u>Weiss v. El Al Israel Airlines, Ltd.</u>, 433 F.Supp.2d 361, 365 (S.D.N.Y.2006), aff'd, 309 Fed. App'x 483 (2nd Cir.2009)).

Two of these provisions—Article 17 and Article 19—are applicable here and state, in pertinent part, as follows:

> Article 17 – Death and Injury of Passengers –
> Damage to Baggage
>
> The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.
>
> _____
>
> Article 19 – Delay
>
> The carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo. Nevertheless, the carrier shall not be liable for damage occasioned by delay if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage or that it was impossible for it or them to take such measures.
>
> Montreal Convention, Art. 17, § 1, Art. 19.

Further, pursuant to Article 29, "any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention… ." Montreal Convention, Art. 29. "It is well settled

13

that this provision means that for all air transportation to which the Convention applies, if an action for damages, however founded, falls within one the Convention's three damage provisions, the Convention provides the sole cause of action under which a claimant may seek redress for his injuries." Weiss, 433 F. Supp. 2d at 365; Ramos v. Am. Airlines, Inc., No. 3:11CV207, 2011 WL 5075674, at *2 (W.D.N.C. Oct. 25, 2011)("Thus, where it applies, the Montreal Convention is the exclusive means for recovery of damages suffered in the course of international air travel and preempts all state law claims.").

Previously, when interpreting a similar provision of the Warsaw Convention, the Supreme Court explained that the Warsaw Convention's "preemptive effect on local law … extends no further than the Convention's own substantive scope.'" Tseng, 525 U.S. at 158. Thus, a carrier "is indisputably subject to liability under local law for injuries arising outside of that scope: *e.g.,* for passenger injuries occurring before any of the operations of embarking or disembarking." Id. at 172 (internal quotations and citations omitted). That is, the substantive scope of Article 17 of the Warsaw Convention "extends to all passenger injuries occurring on board the aircraft or in the course of any of the operations of embarking and disembarking—even if the claim is not actionable under the treaty." King v. Am. Airlines, Inc., 284 F.3d 352, 359 (2d Cir. 2002)(internal quotations and citations omitted).

Subsequently, courts attempting "[t]o determine whether a particular claim is preempted by the Montreal Convention's 'substantive scope'" have used this guidance and have considered "the Convention's liability provisions." Arif Naqvi, 80 F. Supp. 3d at 238 (quoting King, 284 F.3d at 358 (2d Cir.2002); Paradis v. Ghana Airways Ltd., 348 F.Supp.2d 106, 111 (S.D.N.Y.2004) (noting that the preemptive effect of Montreal Convention is "substantially the same" as that of Warsaw Convention). As the First Circuit stated recently, "if an action for damages falls within one of the Convention's damages provisions, then the treaty provides the sole avenue for relief—that is, the Montreal Convention preempts all local claims that fall within its scope, even if the claims are not cognizable (i.e., even if they do not satisfy the conditions for liability) under the Convention." Dagi, 961 F.3d at 27–28 (citing Tseng, 525 U.S. at 161).[7]

---

[7] Some court have noted that conflicting authority exists as to whether cases that are within the general parameters of the Montreal Convention but outside the scope of one of the specific damage provisions are also preempted. Benjamin v. Am. Airlines, Inc., 32 F. Supp. 3d 1309, 1316 (S.D. Ga. 2014) ("Although any state claim that falls within the scope of a liability provision is preempted, there is a split of authority on whether an even wider set of claims is preempted. Some courts have found complete preemption under the Convention … In contrast, a trending majority finds preemption not absolute, but instead "extends no further than the Convention's own substantive scope.")(citations omitted); Knowlton v. Am. Airlines, Inc., No. CIV.A. RDB-06-854, 2007 WL 273794, at *5 (D. Md. Jan. 31, 2007)("There is clearly a split of authority over whether the Montreal Convention and its predecessor completely preempt state law claims such as this one. However, this Court is persuaded by the reasoning of those cases finding in favor of preemption."). It is unnecessary to reach this issue in this case, however, as all of Plaintiff's claims fall within the damage provisions of the Convention.

Here, none of Plaintiff's claims are brought directly under and pursuant to the liability provisions of the Convention. Rather, Plaintiff's claims for breach of contract, negligence, and intentional infliction of emotional distress appear to be state common law claims; the undersigned will assume that Plaintiff's claim for "disability and age discrimination" is a federal statutory claim.

### a. Article 17 Claims

"The substantive scope of Article 17 of the Montreal Convention encompasses events that 'took place on board the aircraft or in the course of any of the operations of embarking or disembarking[.]'" Sanches-Naek v. TAP Portugal, Inc., 260 F. Supp. 3d 185, 192 (D. Conn. 2017)(citing Montreal Convention, Art. 17, § 1).

"Whether a passenger's injuries occurred 'on board the aircraft or in the course of any operations of embarking or disembarking' is a question of law to be decided by the court based on the facts of each case." Dosso v. British Airways, PLC, Civ. No. AW–07–2710, 2010 WL 64922, at *4 (D.Md. Jan. 5, 2010) (quoting Acevedo–Reinoso v. Iberia Lineas Aereas De Espana S.A., 449 F.3d 7, 12 (1st Cir.2006)). "Courts consider the following factors in determining whether a passenger was 'in the process of embarking' a plane within the meaning of the Montreal Convention: (1) the activity of the passenger at the time of the accident; (2) the restrictions, if any, on the passengers' movement;

(3) the imminence of actual boarding; and (4) the physical proximity of the passengers to the gate." <u>Ramos</u>, 2011 WL 5075674, at *2 (W.D.N.C. Oct. 25, 2011)(citing <u>Day v. Trans World Airlines, Inc.</u>, 528 F.2d 31, 33–34 (2d Cir.1975)).

In this case, Defendant contends that the alleged harm to Plaintiff "took place on board the aircraft or in the course of any of the operations of embarking or disembarking." <u>See</u> Def.'s Mem. (Doc. 14-1) at 7-8 ("Plaintiff sought to board the airplane on two separate dates, and he described his proximity to the gate and interactions with gate agents allegedly denying him access to board.")(internal citations omitted).

Plaintiff does not dispute this position and the undersigned agrees that, based on the factual allegations of record, Plaintiff's claims hinge on his interactions with Defendant's employees at the gate and his attempts to embark.

Therefore, as Plaintiff's claims for negligence, intentional infliction of emotional distress, and discrimination appear to seek damages for personal injuries, they are covered by the substantive scope of Article 17 and are preempted. <u>See</u> <u>Sanches-Naek</u>, 260 F. Supp. 3d at 192 ("The Second Circuit has held that federal civil rights and discrimination claims, such as those brought under Section 1981 or Section 1983, are precluded by the Montreal Convention if they arise from acts that fall under the Montreal Convention's

substantive scope."); <u>Arif Naqvi</u>, 80 F. Supp. 3d at 239 ("numerous courts have held that Article 17 preempts federal discrimination claims")(collecting cases); <u>Kruger v. Virgin Atl. Airways, Ltd.</u>, 976 F. Supp. 2d 290 (E.D.N.Y. 2013), aff'd, 578 F. App'x 51 (2d Cir. 2014)(finding the plaintiff's state law claims against an airline for breach of contract, false arrest, malicious prosecution, intentional infliction of emotional distress, negligence, and loss of consortium were preempted by Montreal Convention).

### b. Article 19

In addition to damages associated with his alleged personal injuries, Plaintiff seeks damages for "loss of business opportunity." Pl.'s Am. Compl. (Doc. 6) at ¶ 55. Specifically, the original Complaint indicates that, while Plaintiff was delayed in Miami, a "Real Estate deal was lost to [his] nearest competitor." Pl.'s Compl. (Doc. 1) at 5.

This claim implicates Article 19 which, by its terms, covers situations where damage has been caused "by delay in the carriage by air of passengers, baggage or cargo." <u>See, e.g.,</u> <u>Oparaji v. Virgin Atlantic Airways, Ltd.</u>, 2006 WL 2708034, at *3 (E.D.N.Y.2006) (plaintiff's "claims for damages resulting from

his missed flight" after air carrier employees wrongly accused him of using a forged passport were covered by Article 19, not Article 17).[8]

Consequently, Plaintiff's breach of contract claim is likewise preempted.

## B. Failure to State a Claim

As noted, Plaintiff has not made any claims pursuant to the Montreal Convention and, as discussed above, the claims he has made are preempted. However, in light of his *pro se* status, should any of Plaintiff's claims be construed as having been made pursuant to the Montreal Convention (such that they are not preempted), such claims would fail nonetheless.

Claims made pursuant to the Montreal Convention are subject to a two-year statute of limitations. Montreal Convention, Art. 35 § 1. Specifically, the Treaty states that "[t]he right to damages shall be extinguished if an action is

---

[8] Some courts have noted distinctions in the authorities interpreting Article 19, with some cases finding that claims for nonperformance are not preempted, while claims associated with delay are preempted. See e.g., Vumbaca v. Terminal One Grp. Ass'n L.P., 859 F. Supp. 343, 366–67 (E.D.N.Y. 2012) (citations omitted); Arif Naqvi, 80 F. Supp. 3d at 239–40 (stating that "although some courts have held that the Montreal Convention does *not* preempt claims of contractual nonperformance, other courts, wary of attempts to circumvent the Convention through artful pleading, allow preemption of common law contract claims that are indistinct from plaintiffs' tortious theories of harm" and finding that "the pro-preemption line of cases persuasive")(emphasis in original). This distinction, however, is not relevant in the instant matter as it appears that, notwithstanding being prohibited from boarding initially, Plaintiff was ultimately transported by Defendant from Miami to Asheville. See e.g., Ikekpeazu v. Air France, No. 3:04 CV 00711(RNC), 2004 WL 2810063 (D. Conn. Dec. 6, 2004) (where passenger was prohibited from boarding due to alleged security risk and later boarded without difficulty and arrived at his destination, allegations of resulting financial injury were covered by Article 19).

19

not brought within a period of two years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the carriage stopped." Id.

In this case, Plaintiff arrived at his final destination, Asheville, on August 28, 2016.[9] Therefore, the two-year period during which Plaintiff could bring suit expired on August 28, 2018. However, Plaintiff did not file his original Complaint until nearly a year later, on August 23, 2019.

Accordingly, any claims construed as having been made pursuant to the Montreal Convention are time-barred.[10]

---

[9] Though Plaintiff ought to have arrived sooner than August 28, 2016, the undersigned will use the latest possible date for this purpose.

[10] Defendant also contends that Plaintiff's Amended Complaint fails to state a claim because no "accident" has been alleged. See Sanches-Naek, 260 F. Supp. 3d at 192 (stating that Article 17 "allows for airlines to be held liable only when an accident has caused a passenger to suffer death, physical injury, or physical manifestation of injury")(citations omitted). However, as any claims based on the Montreal Convention would be untimely, an analysis of this alternative argument is unnecessary.

## V. Recommendation

For the reasons stated, the undersigned **RECOMMENDS** that Defendant's Motion to Dismiss (Doc. 14) be **GRANTED**.

Signed: July 13, 2020

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140, 140 (1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).

21